It appearing that there was a written contract covering the sale of the engine from the plaintiff to the defendant, which contained certain stipulations and warranties by the plaintiff, a recovery by the defendant on a cross-action for damages alleged to have been sustained because of the nonperformance of an breach of conditions and warranties, not contained in the written contract but expressly excluded therefrom, was contrary to law and without evidence to support it. It was error to overrule the plaintiff's motion for new trial.
 DECIDED MARCH 20, 1942.
The Worthington Pump and Machinery Corporation brought suit on account against Briarcliff Gardens Inc., to recover a balance of $549.45 alleged to be due for certain machinery and gas-engine parts which were sold on open account by the plaintiff to the defendant as shown by an itemized statement of account attached to the petition. The defendant admitted the correctness of the account sued on but denied liability on the ground that the plaintiff, a non-resident corporation, was indebted to the defendant in an amount in excess of the sum sued for. By way of "set-off or recoupment" the defendant alleged that the plaintiff was indebted to it $17,561.21 as damages growing out of the failure to perform and breach by the plaintiff of a contract under which the defendant purchased a certain gas engine. By the counter-claim the defendant alleged substantially the following facts: On December 17, 1935, the plaintiff sold to the defendant an internal-combustion engine to be operated by natural gas. This engine was purchased for the purpose of operating an electric generator to generate electricity to be used in the operation by the defendant of a laundry, and to furnish current for lights and electric power on the defendant's premises. The plaintiff agreed to furnish to the defendant an expert to supervise the installation of this engine and its parts, and *Page 72 
to start the engine off properly. This expert was called an "erector." The plaintiff was informed and knew what such engine and the electric generator were to be used for and knew the character of the business for which the electricity was to be generated. This machinery was installed during the spring of 1936 under the supervision and direction of such "erector." The machinery was put into operation and appeared to be operating properly, and therefore the defendant accepted the machinery and its installation and began making installment payments to the plaintiff on the purchase-price. Thereafter, in the early part of 1937, and after the laundry plant of the defendant had been enlarged so that it required almost the full-rated capacity of such machinery to supply the necessary electric power and current needed, this gas engine began to break down periodically, which would require the operation of the engine to be discontinued until the necessary parts could be obtained and the engine overhauled and repaired. This happened on several occasions until the defendant, in order to obtain the required electric power so as to keep its laundry plant in operation, had to have a line installed and connected with the electric power lines of the Georgia Power Company, so that the defendant could purchase electric current from the Georgia Power Company and thus operate its laundry. The installation of this line from the plant to the Georgia Power Company, so that the defendant's expense, and in order to obtain the necessary current from the power company the defendant was required to contract with the power company to pay to it a minimum monthly charge for electric current for a period of twelve months, and the current which the defendant thus purchased from the power company cost the defendant more than it would have cost the defendant to generate such electric power with the engine and machinery it had purchased from the plaintiff for that purpose had such engine and machinery operated properly and had the engine operated according to its rated capacity.
It was thereafter discovered that the cause of the frequent breakdowns of the engine and the failure of the machinery to properly run the generator was that such engine was not getting a sufficient supply of water to keep it cool which caused the engine to overhead and burn out its values and other parts. Although the plaintiff knew all the time what the trouble with the engine was it *Page 73 
did not inform the defendant thereof, and did not tell the defendant how to correct such trouble "until after the defendant had finished paying all of the installments on the machinery." It was then that the plaintiff's representative for the first time told the president of the defendant what the trouble with the engine was and how to correct it. The water supply for cooling the engine was obtained from a large elevated water tank, which the defendant had on its premises adjacent to the house wherein this engine was lodged, and the water passed from this tank into and through the water jackets of the engine by gravity pressure alone. The elevation of this tank was not sufficient enough gravity pressure to keep the water circulating in the engine and to maintain the circulation of the water in the engine so as to keep it cool when it was being operated at or about its full-rated capacity. The "erector" of the plaintiff, who supervised the installation of the machinery, failed and neglected to inform the defendant that this water tank was not elevated sufficiently to furnish the water required by the engine, although he knew that such tank was not sufficiently elevated for this purpose. As soon as the defendant was told by the plaintiff what was causing the failure of this engine to function, the defendant at a nominal cost had this water tank sufficiently elevated, and from that time on the defendant had no trouble with such engine. The whole cause of the engine trouble had been that this water tank was too low to afford sufficient gravity pressure to cause the water to run freely into the engine and circulate through its cooling system. As a result of the improper manner in which the machinery had been installed, under the supervision and direction of the plaintiff by the "erector" of the plaintiff, the defendant had to purchase from the plaintiff parts of machinery to replace those parts which had been burned out, to the amount of $1077.26, and also had to purchase parts from others amounting to $339.50. In order to get the Georgia Power Company to furnish electricity to the defendant's premises it cost the defendant $1121.61 to install the necessary electric lines and fixtures, and the defendant also had to contract to pay to the Georgia Power Company for a period of twelve months a minimum stand-by charge of $105 per month. Also during the period while this engine was broken down the defendant was required and did purchase from the Georgia Power Company electric current at a cost of $3143.36 in *Page 74 
excess of what it would have cost the defendant to generate the same amount of electricity had such engine and machinery been skillfully and properly installed so as to function properly, and the defendant has paid the Georgia Power Company $420 of the minimum stand-by charge which the defendant contracted to pay for a period of twelve month, and will be required to pay for the remainder of such twelve months the sum of $840, although since the defendant corrected the improper installation and fault of the engine and machinery by elevating the water tank it is not necessary to use any of the electric current of the Georgia Power Company, all of which loss and damage to the defendant is directly due to the plaintiff's failure to perform its obligations under the contract of purchase to skillfully supervise the installation of the machinery.
In addition to the foregoing losses, the defendant has sustained a loss on account of the shutting down of the operation of its laundry in the sum of $10,000, which loss was due directly to the plaintiff's failure to perform its duties under the contract of purchase to properly and skillfully supervise the installation and starting of the engine and machinery purchased by the defendant from the plaintiff. The defendant prayed that the loss and damage sustained by it be set off against the claim sued on by the plaintiff, and that the defendant have a judgment over against the plaintiff for the excess due the defendant.
By an amendment the plaintiff alleged that the name "Briarcliff Gardens Inc." was a trade-name used by "Briarcliff Incorporated," and that "Briarcliff Incorporated" is the real defendant. This amendment was allowed and the case proceeded against "Briarcliff Incorporated." The plaintiff filed an answer to the "plea of setoff" in which it admitted the sale and purchase of the machinery and alleged that the plea did not set out the full contract of purchase which was in writing, a copy of which the plaintiff attached to its answer as a part thereof. The plaintiff alleged that the engine was properly installed, that a skillful erector was furnished by the plaintiff for that purpose; that such engine was installed and started in a skillful manner, and had it not been for the negligent operation thereof by the defendant the defendant would not have had the trouble alleged by it which was caused solely by the negligence of the defendant in operating such engine. The plaintiff denied any liability, and averred that if the engine had been *Page 75 
properly looked after and had not been overloaded the water furnished from the water tank would have been sufficient to keep the engine cool; that the erector furnished by it had nothing to do with the connection of the water to the engine, and that this was done at the direction and with the labor of the defendant, and that the plaintiff's agent merely directed how the pipe from the water system was to be connected onto the engine; that it offered to sell to the defendant its own pump and cooling system which the defendant declined to purchase; that after the defendant purchased and the plaintiff installed such gas engine the defendant enlarged its laundry plant, and that this necessarily increased the machinery which had to be operated by the gas engine, and that while the engine is automatic it requires attention, to see that it is not overloaded, in order to keep the engine from heating; that the defendant had no one who regularly looked after the engine, and that it was necessary in the operation thereof for the engine to be looked after so as to prevent the trouble which the defendant had; that such trouble would not have occurred if the engine had not been overloaded or if it had been properly attended to; that its agent properly installed the engine and, as the defendant declined to purchase the pump and cooling system, the erector at the defendant's direction supervised the connecting of the pipe conveying the water from the tank to the engine; that this connection was properly made and the engine started, and ran for months and months "and according to the allegations of the defendant's plea of set-off it was over two years after the engine had been sold and put in operation before the new parts had to be purchased." The plaintiff further alleged that the purchase price of this engine totalled $12,099.26, payable $2889.50 cash and the balance in twenty-four monthly installments of $383.70 each; that the cash payment was made and that all of the installments have been paid, and at no time during the payment thereof did the defendant raise any point with reference to any damages which it had suffered as alleged in the plea of set-off; that the period over which these payments were made was more than two years, and the last payment was in 1938, and as the defendant ordered in April, June, July, and August of 1937 merchandise amounting to $527.81, which it also paid without making any claim for any damages against the plaintiff, the defendant is now estopped under the law to claim any damages by reason of the *Page 76 
alleged negligence of the plaintiff in the installation of such engine.
The plaintiff demurred generally and specially to the plea of set-off. On December 5, 1939, the plaintiff again amended the petition and alleged that the indebtedness stated therein arose by virtue of a certain contract dated December 17, 1937, between the plaintiff and the defendant; that the balance sued for is a balance of the purchase-money due by the defendant to it for the gas engine described in the written contract; that there is attached to its answer to the defendant's cross-action a true copy of this contract, and that such contract is a part of the pleadings. On the same day the plaintiff filed its motion to strike the plea and answer and plea of set-off on various grounds. The contract sued on is not contained in or attached to the plea thus attacked.
The defendant filed an amendment to its answer in which it alleged that the water coming from the water tank to the engine was conducted through a pipe two and one-half inches in diameter, and having in it ten elbow curves or joints which diminished the gravity pressure of the water flowing through the pipe, and that the result of the lack of sufficient elevation in the tank and the consequent lack of sufficient pressure prevented an adequate supply of water to cool the engine when it was in operation, and caused it to overheat as set out in the original answer; that the engine was installed during the early part of 1937 and from March 1, 1937, through November 1938 the engine, as the result of overheating, would break down and cease to operate on an average of once a week, requiring one half of one day each week during that time to repair the damage done to the engine as a result of overheating so as to start the engine to operating again. The defendant further amended the plea by striking therefrom the allegation that it was compelled to expend $1039.48 for labor in repairing the engine, and by adding to the allegations thereof relative to sustaining a loss of $10,000 on account of the shutting down of the operation of its laundry the following: "Said loss was occasioned by the fact that during the times when said engine would break down and cease to operate, as hereinbefore set out, the laundry and ice plant (the operation of which were dependent upon electric current generated by the operation of said engine) were shut down, and the employees and laborers in said laundry and ice plant had to remain idle during the time that said engine was being repaired; and in order to *Page 77 
complete the work which otherwise would have been completed on regular time they had to work overtime, and the defendant was compelled to pay them extra for such overtime which they had to work as a result of said breakdowns, said overtime amounting to thirty-one days during said period from March 1937 to November 1938, and the overtime which the defendant was compelled to pay amounted to $328 per day for all such laborers who were kept idle during the period of said breakdowns and for the overtime work for which the defendant had to pay, as aforesaid." The defendant also amended its plea by alleging that it was not until on or about November 30, 1938, that it discovered the improper and unskillful manner in which the engine had been installed.
On June 22, 1940, the plaintiff renewed its motion to strike the plea and answer as amended, on each and all of the grounds stated in the original motion, and averred that the amendment did not cure the defects referred to in the motion to strike. The plaintiff also, on June 22, 1940, demurred generally and specially to the above amendments, and renewed its original demurrers to the plea and answer. On July 2, 1940, the original and renewed motions to strike the defendant's pleadings as amended were overruled. On the same day the plaintiff's original and renewed demurrers to these pleadings of the defendant were overruled. Within the time required by law the plaintiff filed exceptions pendente lite to the judgments overruling its motion to strike and the demurrers above referred to.
The case was tried before a judge and jury. The defendant admitted the correctness of the account sued on and the execution of the contract attached to the pleadings of the plaintiff, and assumed the burden of proof. Evidence was introduced by the defendant tending to support the allegations made in its answer and in the plea of set-off as amended, relative to the making of the contract sued on, the requirements of the defendant for a gas engine, the knowledge by the plaintiff of these requirements, and the recommendations of its agent that the engine would meet these requirements, and the failure of the engine to do so. The plaintiff introduced the written contract which was between the plaintiff and Briarcliff Gardens Inc., dated "Proposal, Atlanta, Ga. Dec. 17, 1935," and accepted January 18, 1936, by Briarcliff Gardens Inc. and approved on the same day by E. Stauverman for the plaintiff. *Page 78 
The contract of sale provided as follows: "All machinery shall be installed and put in operation by and at the expense of the purchaser, unless otherwise expressly stipulated herein. If vendor undertakes herein to supervise erection, or if purchaser desires services of engineers or mechanics to supervise erection, such engineers and mechanics will be furnished by the vendor. Unless otherwise stipulated herein, the purchaser shall pay for such service at the rate of $15 per day, one and one-half times this rate for overtime work, and double this rate for Sunday and holiday work; plus all traveling and living expenses from the time employee leaves vendor's works until return thereto. The purchaser agrees to pay freight or express charges on vendor's erecting tools, and to provide crane facilities when available, or if not available, to provide at his own expense rigging equipment suitable for the erection of the machinery herein specified. Such engineers and mechanics shall have free and unobstructed access to the site of erection of machinery. Purchaser shall furnish safe and proper working conditions, and safe storage for erector's tools. Erection shall not be interrupted by purchaser or other parties. If vendor hereby assumes erection or superintendence of erection, purchaser shall pay all expenditures arising from delays for which vendor is not responsible, including loss of time of engineers and assistants and additional trips. Where vendor does not assume erection, engineers and mechanics furnished shall be purchaser's employees, for whose acts vendor assumes no responsibility." The plaintiff introduced evidence tending to establish the contentions made by it in its answer to the plea of set-off.
The trial resulted in a verdict "in favor of defendant in the amount of $2256.76 less $549.45, making net amount of $1707.31 for defendant," dated May 20, 1941. Judgment was entered against the plaintiff for that sum. The plaintiff moved for a new trial on the general grounds and by amendment added seven special grounds. The motion was overruled and the plaintiff excepted, assigning error on its exceptions pendente lite and on the orders excepted to pendente lite.
The court did not err in denying the motion to strike the plea of set-off, *Page 79 
and in overruling the demurrers to the answer and plea as amended. In order to pass on some of the grounds of the motion and demurrer a consideration of the entire written contract involved in the case is necessary, and while a part of the contract is embraced in the defendant's pleadings the entire contract is not attached thereto or embodied therein. The fact that the entire written contract was attached to the replication or answer of the plaintiff to the plea of set-off would not entitle such contract to be considered in passing on the attacks made by the plaintiff, by way of such motion to strike and demurrers, on the pleadings of the defendant. The plaintiff's pleadings were not in issue under the motion to strike the plea and answer and the plaintiff's demurrers thereto, but only the sufficiency of the defendant's pleadings was involved.
The gist of the counter-claim or cross-action is that the plaintiff breached or failed to perform a certain duty or obligation imposed on it by the terms of a written contract, by which the defendant purchased from the plaintiff a gas engine to be installed on the defendant's premises, thereby damaging the defendant in an amount in excess of the sum due by the defendant to the plaintiff on open account and for which the plaintiff brought suit. The contract for the purchase of this machinery provided that the plaintiff agreed to furnish and deliver to the defendant certain machinery including a "Worthington four-cylinder four-cycle gas engine with cylinders;" the engine to be directly connected to a described electric generator, and that the engine was to be furnished complete with certain parts, fixtures, and accessories, and that there were to be furnished the "services of erector to supervise installation and starting." It appears that the "erector" referred to was a person to supervise the installation of the engine and parts and the starting thereof. The defendant claims that the engine was installed in an unskillful and improper manner by this erector furnished by the plaintiff, as follows: the engine was so installed that the water tank, from which the water for cooling the engine was to be obtained and which was to flow through the pipe to the engine by gravity pressure, was too low to furnish sufficient gravity pressure, and that the plaintiff knew this at the time the engine was installed through the erector furnished by it, because such erector knew when he installed the engine and started the machinery that this *Page 80 
tank was not elevated sufficiently to properly provide water to cool the engine. The defendant contends that as a result of this the engine did not run properly, became overheated, and the damages sued for were caused.
The contract further provided that "all machinery shall be installed and put in operation by and at the expense of the purchaser, unless otherwise expressly stipulated herein," and that "if vendor undertakes herein to supervise erection, or if purchaser desires services of engineers or mechanics to supervise erection, such engineers and mechanics will be furnished by the vendor;" that "where vendor does not assume erection, engineers and mechanics furnished shall be purchaser's employees for whose acts vendor assumes no responsibility." It appears from the contract, which is a printed form of contract, that in the sale of such machinery the plaintiff does not agree to install and put in operation unless it is expressly stipulated in the contract. It is not so stipulated in this contract. It also appears that in some sales the plaintiff undertakes to supervise erection, and in others undertakes to furnish the services of engineers or mechanics to supervise the erection. In the latter event it appears from the contract that any engineer or mechanic furnished by the plaintiff to supervise the installation shall be the employee of the purchaser, that is, the defendant in this case, "for whose acts vendor assumes no responsibility."
The defendant, in its cross-action alleged that the plaintiff "neglected and failed to perform its obligations under said contract to furnish services of a skilled erector and to have the installation and starting of said machinery supervised in a skillful manner;" that the plaintiff, through the mechanic or engineer furnished, "knew" it was not proper to install the engine and connect it with the water flowing from the tank, in that the tank was not elevated sufficiently to have enough water pressure to maintain a flow of water that would keep the engine cool; that with this knowledge the engine was installed and the machinery started, and although it would not operate properly and frequently broke down, as a result of its improper installation as stated, the plaintiff did not inform the defendant that the engine was becoming overheated and would not work properly because it was not given sufficient water to keep it cool; and that "the improper, unskillful and inadequate manner in which said motor was installed and the water supply provided *Page 81 
for" constituted a breach or failure to perform the obligation imposed on the plaintiff by the contract and caused the damages sued for. The written contract did not impose such obligations on the plaintiff. There was no agreement that it would furnish the services of a skilled erector and have the installation and starting of the machinery supervised in a skillful manner, but on the contrary the contract shows that the plaintiff agreed merely to furnish an erector or engineer or mechanic who would supervise the installation and starting of the engine, and that this erector would be the employee of the defendant with his services paid for by the defendant, for whose acts the plaintiff expressly assumed no responsibility.
The defendant's cross-action was a plain attempt to vary the terms of a written contract. Under the written contract no liability was imposed on the plaintiff for the acts of the erector furnished to the defendant to install this machinery, but the defendant expressly agreed that it would pay for the services of such engineer and that he would be its employee. Any oral agreement by the plaintiff at the time or before this written agreement was executed and entered into to the contrary would be merged into and done away with by the written agreement. Any attempt on the part of the defendant to set up such an oral agreement was an attempt to vary the terms of a valid written agreement covering the same subject.
The written contract contained express warranties and agreements, and in such a case the law will not imply that the plaintiff agreed to the contrary. See Malsby v. Young,104 Ga. 205 (30 S.E. 854); Code, § 96-301; 55 C. J. 715.
Under the written contract the verdict in favor of the defendant's counter-claim was contrary to law. The court erred in overruling the plaintiff's motion for new trial on the general grounds.
Judgment reversed. Sutton and Felton, JJ., concur.